UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALEX MARTINEZ,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 20-2726 (APM)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF MATTHEW S. DAVIES**

I, Matthew S. Davies, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am currently the Executive Director, Admissibility and Passenger Programs (APP), Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have been in this position since November 4, 2020, first in a temporary acting role, which became permanent on January 3, 2021. During my 19 years of Federal service, I have held various leadership positions, including Director for the Electronic System for Travel Authorization Program Management Office in Washington, D.C.; Area Port Director in Chicago, Illinois; Acting Executive Director for Acquisition Policy and Oversight in Washington, D.C.; Port Director in Dublin, Ireland; and Acting Division Chief-Mission Support at San Diego Border Patrol Sector.

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

2. In my current position, I have responsibility for overseeing and coordinating OFO programs and policy related to the admission and processing of international visitors and travelers to the United States at over 328 ports of entry. I oversee more than 170 employees across ten Director level program offices, including the Trusted Traveler Programs (TTP) office.

3. In my role as Executive Director, APP, I am responsible for overseeing the establishment of policy to ensure that individuals who apply for participation in one of CBP's TTPs meet all appropriate qualifications for the program and do not pose a risk to the United States. I am therefore responsible for executing the mission of CBP and, in particular, OFO.

4. I am familiar with the complaint filed in *Martinez v. U.S. Customs and Border Protection*, Civ. A. No. 20-02726 (APM) (D.D.C.) and Plaintiff Alex Martinez's claims therein.

5. I provide this declaration to explain how CBP adjudicated Mr. Martinez's applications to the NEXUS program, submitted February 13, 2019, and December 14, 2019. The administrative record with redactions of law enforcement privileged information was provided to Mr. Martinez on December 17, 2021.

6. This declaration supplements the Declaration of Pete R. Acosta, filed April 5, 2021, (hereinafter, "Acosta Declaration") which provided background on CBP's TTPs and Mr. Martinez's applications to NEXUS at issue in this case. This declaration provides further information, including certain law enforcement privileged information, regarding the rationale underlying the denial of Mr. Martinez's applications submitted on February 13, 2019, and December 14, 2019, for participation in the NEXUS program and discusses

2

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

~~FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE~~

how the adjudication process is reflected in the administrative record. *See* Acosta Declaration, ECF 15-2.

7. Paragraphs marked with "(LEP)" contain information that CBP has redacted from the public filing as Law Enforcement Privileged. As discussed further below, in my judgment as Executive Director of APP, I have determined that the disclosure of the information marked as LEP would be contrary to the public interest because it would reveal information about CBP's law enforcement methods, techniques, and practices; identify and expose sensitive information about CBP's TTPs; jeopardize integrity of CBP's systems; put CBP officer safety at risk and cause harm to CBP's law enforcement interests. CBP takes steps to protect these types of information, which are not generally known by the public.

## Overview of Vetting Process

8. As indicated in the Acosta Declaration, NEXUS is a bilateral arrangement between CBP and the Canada Border Services Agency (CBSA). Acosta Declaration, ECF 15-2 ¶ 8. CBP and CBSA separately conduct their own vetting processes and risk assessment of each applicant to NEXUS. *See id.* ¶ 9. Each agency determines whether the applicant meets standards for membership—denial by either country precludes the applicant's membership in the NEXUS program. *See id.* ¶¶ 9, 12.

9. The Acosta Declaration lays out the eligibility criteria for NEXUS. *See id.* ¶¶ 10-12. Generally, CBP may deny an applicant membership in NEXUS, if, at its sole discretion, the agency determines that the applicant does not meet program requirements or is not

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

sufficiently low risk.[1] In approving an applicant for membership in NEXUS, CBP must be assured that the applicant will adhere to program rules and requirements; immigration and customs laws; and directions by law enforcement officials as well as be assured that the applicant will not otherwise engage in behavior that could potentially endanger national security or border security. In addition to comprehensive reviews of any potentially derogatory information, part of the determination of whether an applicant poses risk to the integrity of the NEXUS program, as well as to national and border security more broadly, necessarily includes an officer's discretion informed by training, knowledge, and experience. The TTPs help to re-allocate limited resources towards individuals and cargo that may pose a higher risk to national and border security. Therefore, if CBP cannot establish that an individual meets all of the NEXUS criteria, that person is not eligible to utilize the program and would be subject to CBP's usual primary inspection process, like any other traveler who arrives at a port of entry who is not a member of a TTP.

10. Upon receipt of an application, CBP reviews the applicant's information and runs checks against various government databases. *See* Acosta Declaration, ECF 15-2 ¶ 9, 15. To be eligible for a joint CBP/CBSA interview at an enrollment center, an applicant must be conditionally approved by clearing vetting by both CBP and CBSA. *See id.* ¶ 9. On CBP's end, the initial vetting process includes the completion of a Risk Assessment Worksheet (RAW) that officers utilize to investigate an applicant's potential threat to border security and suitability for a TTP.

---

[1] *See* Utilization of Global Entry Kiosks by NEXUS and SENTRI Participants, 75 Fed. Reg. 82202, December 29, 2010; 8 C.F.R. § 235.12(b)(2); *see also* https://www.cbp.gov/travel/trusted-traveler-programs/nexus/nexus-eligibility.

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

11. At the enrollment interview, CBP is able to collect further information from the applicant, including fingerprints, to verify identity and perform further records checks. A thorough background check of the applicant is necessary to ensure that only sufficiently low-risk travelers are granted membership in the program. *See id*. ¶ 14. This includes review of various records, such as criminal history, travel history, and information provided by the applicant. This thorough vetting before granting membership in NEXUS helps to ensure that CBP is able to properly focus its resources on individuals who present higher risk.

12. The final determination regarding whether an applicant should be granted membership is contingent on the final decisions of the joint CBP/CBSA vetting of the applicant, the submission of fingerprints, and the results of the joint interview. *Id*. ¶ 9.

13. Should an applicant believe that CBP's membership decision was based on incomplete or inaccurate information, the applicant is able to submit a request for reconsideration by the CBP Ombudsman. Upon receipt of a request for reconsideration, the Ombudsman will review the decision to deny or revoke membership, including the underlying information available to the officers and the rationale provided, as well as any information that the applicant includes in the reconsideration request. The Ombudsman decides whether approval or reinstatement of membership is warranted. *Id*. ¶ 16.

**Contents of the Administrative Record and Law Enforcement Privilege**

14. The administrative record of a TTP membership decision includes the information that CBP considered in making its determination to approve or deny the applicant's membership in that program, which includes documents such as the application itself, records checks, RAWs, comments in CBP systems by officers conducting vetting and

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

interviews, documentation submitted by the applicant, decision letters communicated to the applicant, requests for reconsideration of a membership denial, comments from the Ombudsman in reviewing the applicant's application, and decisions of the Ombudsman as to whether the exercise of discretion is warranted. Most of this information is housed in CBP's law enforcement system referred to as "DHS/CBP-002 Trusted and Registered Traveler Programs (TRTP),"[2] formerly known as the Global Enrollment System, that stores records related to TTP applications, including information submitted by the applicants, as well as law enforcement sensitive information associated with the adjudication of such applications.

15. Portions of the administrative record and this declaration regarding information CBP considers in determining whether a NEXUS application should be approved and commentary by CBP personnel analyzing risk posed by the applicant are law enforcement privileged. This information is sensitive because it reveals the type of information CBP analyzes in adjudicating TTP applications and the weight that the information carries in the adjudication process. Disclosure of such information would allow individuals to identify any possible information gaps, manipulate information they provide to CBP, and change their behavior to avoid detection, which could facilitate the admission of high-risk travelers to TTPs. The acceptance of high-risk travelers into TTPs would create serious security risks at our nation's borders as such travelers who may

---

[2] *See* Privacy Act of 1974: Implementation of Exemptions; Department of Homeland Security/U.S. Customs and Border Protection-002 Trusted and Registered Traveler Programs (TRTP) System of Records, 85 Fed. Reg. 14,214 (Mar. 11, 2020) (previously known as the "Global Enrollment System"); *see also* Privacy Impact Assessment for the Global Enrollment System: Trusted Traveler Program (TTP) System, DHS/CBP/PIA-002(d) (August 15, 2017), https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp002-gesttp-august2017.pdf.

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

otherwise be more likely to undergo enhanced inspection could take advantage of the privileges conferred to TTP members including expedited processing for entry at ports of entry. This could impede CBP's efforts to interdict potentially dangerous travelers.

16. Although several factors considered by CBP officers when processing TTP applications have been incorporated into the relevant regulations and otherwise published in the public domain, the redacted information in the administrative record contains specific information regarding law enforcement methods, techniques, and procedures, not generally known to the public, which are employed by CBP to identify high-risk travelers that threaten border security and national security.

17. Internal law enforcement systems codes and navigation tools have been redacted because release of systems information would enable an individual knowledgeable in computer mainframes and systems to improperly access the system, facilitate navigation or movement through the system, allow manipulation or deletion of data, and interfere with law enforcement activities.

18. Information that would reveal the identity of CBP personnel has been redacted as the release of this information would constitute an unwarranted invasion of privacy, and law enforcement agency personnel have a protectable privacy interest in their identities that would be threatened by disclosure. The identification of an individual in association with the performance of their duties at a law enforcement agency creates a safety threat and risks unwarranted attribution and attention to the employee beyond the confines of his or her employment and into his or her personal life. The revelation of officer and other law enforcement personnel identities would not shed light on the activities of CBP in adjudicating Mr. Martinez's NEXUS applications, and thus the officers' privacy interests

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

outweigh the public interest in disclosure. Sensitive personally identifiable information related to Mr. Martinez, such as his date of birth, address information, and identification document numbers has been redacted to protect the privacy interests of Mr. Martinez. Mr. Martinez's sensitive information was not redacted in the version of the administrative record that was served upon Mr. Martinez, but it is not suitable for public disclosure.

19. Finally, the administrative record contains a document from TECS[3] (not an acronym), CBP's primary law enforcement database that contains enforcement, inspection and intelligence records related to the antiterrorism and law enforcement mission of CBP and numerous other federal agencies. *See* Document 5, USCBP000014. Specifically, TECS assists officers with screening and determinations regarding admissibility of arriving persons. "Document 5" contains records of Mr. Martinez's border crossings through U.S. ports of entry, as well as other information used by officers in conducting an inspection and determining the admissibility of a traveler seeking to enter the United States. Information in this document subject to law enforcement privilege consists of TECS search menu options that reveal TECS system search capabilities and criteria entered by CBP officers to generate the document. Release of such information would impede CBP's law enforcement mission by alerting individuals to how CBP conducts searches of its systems and any limitations of the search capabilities. Disclosure of this information would reveal possible gaps that may be exploited by illicit actors to avoid detection. In addition, the document contains notations of whether CBP had determined Mr. Martinez warranted further scrutiny during inspection and displays the type of information used by

---

[3] *See* Privacy Act of 1974, TECS System of Records Notice, 73 Fed. Reg. 77,778 (Dec. 19, 2008).

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

CBP officers in making such determinations. CBP considers such information from TECS subject to law enforcement privilege because information regarding how CBP conducts border inspection would permit individuals to alter their patterns of conduct, adopt new methods of operation, relocate, change associations, and effectuate other countermeasures, thus corrupting the integrity of ongoing law enforcement efforts. Personally identifiable information of inspecting CBP officers was redacted to protect those officers' privacy interests.

**Mr. Martinez's Initial NEXUS Application**

20. Mr. Martinez submitted his initial online application for NEXUS membership on February 13, 2019, via the TTP website, which is included in the administrative record as "Document 3," USCBP000007-USCBP000010. After receiving this application, CBP began initial vetting of Mr. Martinez using the information provided in his application, as well as certain systems checks, such as for border crossing records, included in the administrative record at "Document 5," USCBP000014. Information has been redacted from this document as indicated above in Paragraph 19. Additional law enforcement systems checks conducted during the initial vetting phase are reflected in the RAW located at "Document 4," USCBP000011-USCBP000013.

21. Mr. Martinez was conditionally approved after initial vetting was performed. He then became eligible to schedule a joint CBP/CBSA interview at a TTP Enrollment Center. This interview was conducted on November 12, 2019. At this interview, CBP was able to speak with the applicant as to his request for membership and obtain more information to inform whether the applicant should be granted access to the NEXUS program. Mr. Martinez signed a Trusted Traveler Briefing document, "Document 6" located at

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

USCBP000015, at this interview indicating that he read and would abide by the rules of the TTP.

22. (LEP) CBP personnel recorded a comment in the TRTP reflecting what transpired during the November 12, 2019, interview.  *See* Document 2, USCBP000006.  This comment notes that Mr. Martinez had not been employed since 2012 and had stated during the interview that he was working for free to investigate a cross-border corruption case worth two billion dollars.  *Id.*  According to the comments, Mr. Martinez told the officer during the interview that he was seeking a NEXUS card to claim his two billion dollars. *Id.* [LEP]  Mr. Martinez indicated during the interview that he does not take any medication, [LEP]. *See id.*  During the interview, Mr. Martinez attempted to give the interviewing CBP officer a USB drive that he alleged contained "material evidence" against CBSA and the Royal Canadian Mounted Police (RCMP), which the CBP officer refused to accept.  *Id.*

23. Portions of "Document 2," the comments recorded by CBP officers in TRTP, have been partially redacted as law enforcement privileged because revealing that information would enable bad actors to discern what CBP considers in adjudicating TTP applications, the weight provided to certain factors, as well as certain internal processes and alerts that would allow applicants to manipulate information provided to CBP, change behavior, and avoid detection that could facilitate the acceptance of high-risk travelers into TTPs.

24. After the interview, on November 13, 2019, Mr. Martinez submitted several documents to CBP to support his NEXUS Application via email that indicate that he is seeking to uncover corruption.  These documents are located at "Document 7" through "Document

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

10" of the administrative record, USCBP000016-USCBP000027.  These documents purport to include evidence regarding "a case and file that caused an international incident," which Mr. Martinez alleges to have misled CBP personnel as to a "'Public Mischief,' 'Criminal Negligence,' 'Attempted Murder' and 'Harassment' case caused by Public Servants from several Police Forces."  Document 7, USCBP000016.  While "Document 7" indicates that it is in response to a request from CBP in Montana, following a reasonable search, CBP has not identified any record indicating that such a request for additional information was made to Mr. Martinez.  Mr. Martinez further provided a copy of an application to initiate a proceeding between himself, the RCMP and the CBSA related to alleged violations of the Canadian Privacy Act.  *See* Document 8, USCBP000017-USCBP000022.  "Document 9," USCBP000023-USCBP000024, is purported to be in response to a request from CBP for additional information as to Mr. Martinez's employer per an "Additional Documentation Request Instructions" document.  Following a reasonable search, CBP has not identified any record indicating that such a request for additional information was made to Mr. Martinez.  "Document 10," USCBP000025-USCBP000027, is a letter from Mr. Martinez to the Victims Fund Manager of the Canadian Department of Justice requesting financial assistance to "complete several internal investigations concerning the criminal conduct of Police Officers and Public Service Employees" alleged by Mr. Martinez to be supported by the Government of Canada.

25. Documents 7- 10 (USCBP000016-USCBP000027) were entered into TRTP on November 15, 2019, and are included under the "Attachments" panel on page USCBP000004 of "Document 1," which represents an overview of the information input

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

into TRTP during the vetting of Mr. Martinez's applications, including information that he provided, as well as commentary from CBP personnel in adjudicating the application and references to the RAWs completed for each of Mr. Martinez's applications. *See* Document 1, USCBP000001-USCBP000005.

26. (LEP) Upon review of the documentation provided by Mr. Martinez after his interview at the Enrollment Center, CBP further noted Mr. Martinez's comments that inquiries conducted by CBP were "excessive." *See* Document 2, USCBP000006; *see also* Document 9 at USCBP000023. Based on statements within the letters that were submitted on November 13, 2019, LEP ████████████████████████████████████████ *See* Document 2, USCBP000006; *see also* Document 9 at USCBP000023.

27. (LEP) CBP determined that the applicant should not be accepted into the NEXUS program as he was unable to provide CBP with an explanation as to his employment, how he was able to support himself financially or why he was seeking entry into the United States. Thus, CBP concluded that it would be best for Mr. Martinez to undergo full primary inspection upon arrival to the United States. LEP ████████████████████████████ the applicant's attempt to provide evidence against the Government of Canada and the articulation that he was seeking to uncover cross-border corruption worth two billion dollars. After the interview, CBP considered the additional documentation submitted by the applicant, which further focused on the investigation of corruption, and LEP ████████████████████ language in one of the letters about CBP's

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

inquiries being "excessive." It is important for members of TTPs to cooperate with CBP and be forthcoming with information so that the agency can ensure the individual's low risk to border security throughout their duration of membership in the program.

28. Mr. Martinez's initial application was denied on November 15, 2019. As indicated in the Acosta Declaration, as a result of a technical anomaly, CBP was not able to retrieve the archived letter communicating to Mr. Martinez the denial of his initial application for participation in NEXUS. Acosta Declaration, ECF 15-2 ¶ 17. However, given that Mr. Martinez submitted a request for reconsideration of his application, and that can only occur after an application is denied, CBP is assured that the denial notification occurred.

29. On November 15, 2019, Mr. Martinez submitted a request for reconsideration of his initial application for NEXUS membership to the CBP Ombudsman. This request is contained as it is recorded in TRTP in "Document 11," USCBP000028-USCBP000030. Mr. Martinez indicated in his reconsideration request that he had provided all information requested and stated that the case information supplied to CBP by Mr. Martinez "proves a massive government error that has been determined…by the courts to be attributed to scandal, public mischief and homosexual misconduct and misbehaviour [sic]." Document 11 at USCBP000028. Mr. Martinez claimed that he was "the victim to very sick and heinous acts done by criminals within our justice system." *Id.*

30. (LEP) The CBP Ombudsman reviewed Mr. Martinez's request for reconsideration, initial application, information submitted by Mr. Martinez, and the initial reviewing officers' vetting of the application, including comments in TRTP. LEP [redacted]

██████████████████████████████████

██████████████████████████████████

████████ *See* Document 2, USCBP000006; *see also* Document 11 at USCBP000029-USCBP000030 (containing the same comments). ████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████  *See* Document 2, USCBP000006; *see also* Document 11 at USCBP000029-USCBP000030 (containing the same comments). Portions of Document 11 containing Mr. Martinez's reconsideration request have been redacted to prevent the disclosure of navigation tools within law enforcement systems to ensure the security of TRTP from unlawful interference. Redactions have been made to comments input by personnel that would reveal factors that CBP considers in adjudicating TTP applications and internal processes, the knowledge of which could allow bad actors to modify their behavior and the information they provide to CBP to circumvent the controls placed on the TTPs to ensure only low-risk individuals participate in the program. Information that would reveal the identities of CBP personnel has also been redacted to protect their privacy interests.

31. The CBP Ombudsman sustained the denial of Mr. Martinez's initial application for NEXUS membership on December 11, 2019, which was communicated to Mr. Martinez via a letter presented at "Document 12," USCBP000031, in the administrative record. A portion of this letter is redacted to prevent the revelation of an internal CBP file path where the letter is located in CBP systems to prevent aiding unauthorized access.

### Mr. Martinez's Second NEXUS Application

32. (LEP) On December 14, 2019, Mr. Martinez submitted a second application for NEXUS membership. *See* Document 13, USCBP000032-USCBP000035. CBP conduced initial vetting as described above relating to Mr. Martinez's first application and completed the RAW present at "Document 14" in the administrative record, USCBP000036-USCBP000039. The RAW indicates that the officer conducting the risk assessment LEP ▮▮▮▮▮▮▮▮▮▮▮▮. *See* Document 14 at USCBP000037. The RAW comments note that LEP ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* The reviewer who completed the RAW for Mr. Martinez's second application LEP ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* LEP ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

33. Redactions have been made to remove law enforcement privileged information in "Document 14" including internal identification numbers, navigation tools, and querying formats that would aid bad actors in navigating law enforcement systems upon unlawful access. Revealing the exact searches performed could also enable bad actors to identify information gaps and alter their behavior and what information they provide to CBP to circumvent controls on the TTPs to ensure only low-risk individuals obtain access to the TTPs. Identifying information of law enforcement personnel has been redacted to protect their privacy interests. Finally, commentary from CBP personnel on impressions

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

regarding the applicant's risk level has been redacted as it identifies the factors that CBP was considering in adjudicating the application, which could allow bad actors to modify their behavior and the information they supply to CBP to obtain improper access to TTPs, exposing the programs to risk.

34. On September 16, 2020, CBP denied Mr. Martinez's reapplication for NEXUS membership. This decision was communicated to Mr. Martinez via "Document 15," USCBP000040-USCBP000041, in the administrative record. This letter articulated that Mr. Martinez was denied membership in NEXUS as he did not meet program eligibility requirements. Document 15 at USCBP000040. The only redaction to this letter is to prevent the disclosure of an internal CBP file path where the letter is located in CBP systems because release of such systems information would enable an individual knowledgeable in computer mainframes and systems to improperly access the system, facilitate navigation or movement through the system, allow manipulation or deletion of data, and interfere with law enforcement activities.

35. On September 17, 2020, Mr. Martinez submitted a request for reconsideration to the CBP Ombudsman, contained in administrative record "Document 16," USCBP000042-USCBP000044, displayed as it appears in TRTP. Mr. Martinez's request for reconsideration, according to its language, was based upon his allegation that he does not have any "criminal record, conviction, or, anything else that would impede or interfere and justify the denial…." Document 16 at USCBP000042. To support his reconsideration request, Mr. Martinez attached a Freedom of Information Act (FOIA) response from CBP related to his prior NEXUS application. The letter from CBP to Mr. Martinez on his FOIA request is contained in the administrative record at

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

FOUO//SUBJECT TO LAW ENFORCEMENT PRIVILEGE

USCBP000045-USCBP000052. The records released pursuant to Mr. Martinez's FOIA request that were attached to Mr. Martinez's request for reconsideration are contained at USCBP000053-USCBP000058. The redactions made to those records were completed as a part of the FOIA process. Mr. Martinez also attached a copy of the September 16, 2020 notice of denial of his second application to support his reconsideration request, which is present in the administrative record at USCBP000059-USCBP000060.

36. Portions of "Document 16" containing Mr. Martinez's reconsideration request of his second application as displayed within the TRTP system have been redacted to prevent the disclosure of navigation tools within law enforcement systems to ensure the security of TRTP from unlawful interference, as discussed above. Portions of comments made in TRTP by CBP personnel that would reveal factors that CBP considers in adjudicating TTP applications and internal processes, the knowledge of which could allow bad actors to modify their behavior and information they provide to CBP to circumvent the controls placed on the TTPs to ensure only low-risk individuals participate in the program, have been redacted. Information that would identify CBP personnel has been redacted from "Document 16" to protect their privacy interests.

37. (LEP) The CBP Supervisory Ombudsman reviewed Mr. Martinez's reconsideration request, as well as other materials contained in the administrative record, such as information submitted by the applicant and prior comments by reviewing officers in TRTP from the initial and second applications. The Supervisory Ombudsman specifically reviewed this request and determined that no change from the previous Ombudsman review was warranted LEP ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Document 16 at USCBP000043-USCBP000044.

38. (U)  On September 20, 2020, the CBP Supervisory Ombudsman sustained the denial, a decision which was communicated to Mr. Martinez via "Document 17" at USCBP000061.  The redaction to this letter is to prevent the revelation of an internal CBP file path where the letter is located in CBP systems to prevent aiding unauthorized access, as discussed above at paragraph 35.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 14th day of January 2022.

_____
Matthew S. Davies
Executive Director
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection